IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

ANGELO PECELLO RIVERS,

        Plaintiff,

v.                              Case No. 5:08cv61/RS/EMT

ASPLUNDH TREE EXPERT COMPANY,

        Defendant.

_____/

## ORDER, REPORT AND RECOMMENDATION

This cause filed *pro se* by Plaintiff Angelo Pecello Rivers ("Rivers") pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), is before the court upon the motion for summary judgment filed by Defendant Asplundh Tree Expert Company ("Asplundh") (Doc. 45).[1] Also pending are Asplundh's motion to strike portions of Rivers' affidavit (Doc. 58) and its motion for enforcement of sanctions (Doc. 63). As set forth below, the court grants in part and denies in part Asplundh's motion to strike. It also recommends that Asplundh's motion for enforcement of sanctions be granted in part and denied in part and that its motion for summary judgment be granted.

I.      PROCEDURAL HISTORY

Rivers—who is black—filed a complaint of racial discrimination against Asplundh with the Equal Employment Opportunity Commission ("EEOC") in October 2006 (Doc. 5 at 11). On December 5, 2007, the EEOC dismissed Rivers' complaint, closing its file and giving him notice of his right to bring suit in federal court (*Id.* at 7). This action timely followed by Rivers' filing a

---

[1] The court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331. Asplundh does not contest personal jurisdiction or venue, and the court finds a sufficient basis for each.

complaint on March 5, 2008 (Doc. 1). The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive actions. *See* N.D. Fla. Loc. R. 72.2(E); *see also* 28 U.S.C.§ 636(b)(1)(B)(C); and Fed. R. Civ. P. 72(b). The court granted Rivers' request to proceed in forma pauperis and instructed him to file an amended complaint. Rivers alleges in his amended complaint that Asplundh discriminated against him on the basis of his race when it laid him off from his position as a tree trimmer and did not rehire him (Doc. 5). As relief, Rivers seeks an order directing Asplundh to reemploy him, to apologize for falsely accusing him of forgery and theft in connection with his receipt of pay for three days' work he admittedly did not perform, and to pay him monetary damages of $10,000,000. On August 29, 2008, the same date the court issued its Final Scheduling Order, Asplundh filed a motion to compel Rivers' written discovery responses (Doc. 17). Over the course of discovery Asplundh filed two additional motions to compel as well as two motions for sanctions; one of the motions for sanctions was related to Rivers' failure to attend a scheduled deposition and the other was related to his continued failure to respond to discovery requests (respectively, Docs. 25, 33, 27, 37). The court granted all of these motions and to date has awarded attorneys' fees to Asplundh totaling $1779.10 in connection with the first two motions to compel (respectively, Docs. 23, 31, 42, 43).[2] It is undisputed that Rivers has not submitted payment to Asplundh toward either award. In its order dated December 3, 2008, the court also advised Rivers that the continued failure to comply with the court's orders could result

---

[2] Asplundh has submitted documentation in support of its requests for expenses in bringing its third motion to compel (Doc. 52, in the amount of $560.80) and its two motions for sanctions (Doc. 53, in the total amount of $5747.39). As to all three motions, Rivers was afforded the opportunity to be heard on the issue of imposition of sanctions or the reasonableness of the amounts claimed by Asplundh, or both (*see* Docs. 42, 43), but he has not responded.

Asplundh had attempted in good faith to obtain the requested discovery before filing the third motion to compel and that the appropriate sanction for Rivers' conduct was to require him to pay the expense of bringing the motion (*see* Doc. 42). With respect to the motions for sanctions, the court determined that Rivers' prior failure to comply with the court's orders warranted an award of expenses; additionally, the court concluded that the appropriate sanction for the egregious conduct alleged by Asplundh in connection with Rivers' first deposition was to require Rivers to pay the reasonable costs and expenses of Asplundh's counsel for attending the deposition (*see* Doc. 43). Rivers has failed to provide any justification for his failure to provide the requested discovery, and he has not asserted any circumstances that make an award of expenses for the third motion to compel unjust. Nor has Rivers come forward with any satisfactory justification or explanation for his acts or omissions with respect to either of the motions for sanctions.

Upon review of Asplundh's documentation of fees and expenses (Docs. 52, 53), the court concludes that the claimed amounts of $560.80 and $5747.39 are reasonable. In addition to the $1779.10 previously assessed, therefore, Rivers should be required pay Asplundh $6308.19. The total amount owed by Rivers to Asplundh for discovery-related sanctions therefore is $8087.29.

in the imposition of further sanctions, including the dismissal of his action pursuant to Fed. R. Civ. P. 37(c)(1) (Doc. 42). On December 8, 2008, Asplundh filed its motion for summary judgment (Doc. 45), along with a statement of undisputed facts (Doc. 46) and numerous exhibits (Doc. 47). The court issued an advisement order informing the parties of the importance and ramifications of summary judgment consideration and provided them with information as to the requirements for materials submitted for Rule 56 review (Doc. 48). Rivers filed a response to the motion for summary judgment (Doc. 54), his own affidavit (Doc. 55), and a statement of disputed facts, with exhibits (Doc. 56).[3] Asplundh then filed its motion to strike portions of Rivers' affidavit (Doc. 58), to which Rivers responded in opposition (Doc. 61). Asplundh also filed a motion to enforce the awards of sanctions against Rivers and, pursuant to Fed. R. Civ. P. 37(b)(2)(C), to dismiss this action on the ground Rivers has failed to pay Asplundh $1779.10 in sanctions as previously ordered by the court (Doc. 63). Rivers opposes this motion (Doc. 67).

II.     MOTION FOR ENFORCEMENT

As a threshold, potentially dispositive, matter the court addresses Asplundh's motion to enforce the awards of the still-unpaid monetary sanctions against Rivers totaling $1779.10 and its request for dismissal of the action for Rivers' failure to comply with the court's orders.[4] In support of its motion, Asplundh cites Rivers' deposition testimony in which he acknowledges receipt of the court's order directing him to pay Asplundh the first award of $612.50 but indicates he cannot comply due to financial incapacity (*see* Doc. 63 at 4). Responding to the motion, Rivers reiterates the position that he does not have the funds to pay the monetary sanctions imposed (Doc. 67 at 2). In a lengthy argument, Rivers also apparently submits that the requested discovery was duplicative, burdensome, irrelevant, and/or vexatious.

---

[3] The court has located several documents among the exhibits filed as attachments to Rivers' statement of facts that fail to comply with the privacy requirements set out in Fed. R. Civ. P. 5.2(a). Rather than poring over the exhibits to identify every possible violation of Rule 5.2(a), the court will simply direct to the clerk to seal all of the exhibits that are attached to Docket Entry # 56.

[4] Asplundh does not specify whether dismissal should be with prejudice or without. Should Rivers attempt to refile his suit, the effort might be barred pursuant to Title VII's requirement that a plaintiff must file his complaint in the district court within ninety (90) days of his receipt of a right-to-sue letter. *See* 42 U.S.C. § 2000e-5(f)(1). Given the possibility, indeed the likelihood, of that result the court concludes that Asplundh's request should be treated as one for dismissal with prejudice.

Rule 37(b)(2)(C) of the Federal Rules of Civil Procedure authorizes a district court to dismiss an action in whole or part as a sanction for failing to comply with a discovery order. Fed. R. Civ. P. 37(b)(2)(C); *see also* Fed. R. Civ. P. 37(b)(2)(A)(v). While the court has broad discretion in imposing Rule 37 sanctions, *see* United States v. Certain Real Property Located at Route 1, Bryant, Ala., 126 F.3d 1314, 1317 (11th Cir. 1997), and BankAtlantic v. Blythe Eastman Paine Webber, Inc., 12 F.3d 1045, 1048 (11th Cir. 1994), "this discretion is not unbridled." Wouters v. Martin County, 9 F.3d 924, 933 (11th Cir. 1993). Dismissal with prejudice may be proper only if the party's failure to comply with the court's order is a result of willfulness or bad faith and lesser sanctions would not suffice. Certain Real Property Located at Route 1, Bryant, Ala., 126 F.3d at 1317 (observing that the decision to dismiss a claim under Rule 37 should be a last resort); Navarro v. Cohan, 856 F.2d 141, 142 (11th Cir. 1988) (holding that dismissal under Rule 37 "is an extreme remedy and should not be imposed if lesser sanctions will suffice."); BankAtlantic, 12 F.3d at 1049 (stating that in cases in which the ultimate sanction of default or dismissal is imposed the court must find willfulness or bad faith). In Malautea v. Suzuki Motor Co., Ltd., 987 F.2d 1536, 1542 (11th Cir. 1993), the Eleventh Circuit stated that the "[v]iolation of a discovery order caused by simple negligence, misunderstanding, or inability to comply will not justify a Rule 37 default judgment or dismissal." The court is obliged to construe a *pro se* litigant's submissions liberally. *See* Haines v. Kerner, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972) (recognizing that *pro se* complaints should be held to "less stringent standards" than pleadings drafted by attorneys). Nevertheless, a party who proceeds *pro se* must comply with the same procedural rules that other litigants must follow. Moon v. Newsome, 863 F.2d 835, 837 (11th Cir. 1989) (stating that "once a *pro se* litigant is in court, he is subject to the relevant law and rules of court, including the Federal Rules of Civil Procedure."). Moreover, a party's status as an indigent does not limit the court's discretion to impose monetary sanctions against him. *Id.* at 838. While an in forma pauperis litigant facing a monetary sanction "should attempt to comply with the sanction or detail unsuccessful efforts to comply for the court," if the litigant "comes forward showing a true inability to pay, it might be an abuse of discretion for the court then to dismiss for failure to pay." *Id.* (citation omitted). Before dismissing a litigant's claim pursuant to Rule 37 for failing to pay a sanction, the district court must at least consider a litigant's statement that he lacks the financial capacity to pay. *See* Taylor v. Taylor, 133 Fed. Appx. 707, 710 (11th Cir. 2005).

Rivers' indigent "status alone does not make obvious [his] inability to pay any costs whatsoever." Moon, 863 F.2d at 838. Also, the IRS Form 1040A Rivers submitted in support of his claim of financial incapacity (Doc. 71), which shows he reported only $2801 in income for 2008, has little evidentiary value as the form is unsigned, undated, and otherwise unverified. Furthermore, Rivers' statements in his deposition and response to Asplundh's motion that he has no money are not, by themselves, sufficient to establish his true inability to pay the sanctions imposed. In sum, considering each of the foregoing reasons individually, the court cannot conclude that Rivers has adequately demonstrated a true inability to pay the sanctions. Taking these considerations together, however, the court is reluctant to conclude that the ultimate sanction of dismissal with prejudice is appropriate. The information available to the court—including Rivers' indigent status as reflected in the in forma pauperis application the court granted; his repeated statements, some under oath, to the effect that he is without funds to pay the sanctions; and the IRS Form 1040A which Rivers in fact submitted twice (the second time in an attempt to comply with the court's instructions regarding compliance with Fed. R. Civ. P. 5.2(a))—does not suggest conduct consistent with the "flagrant disregard [ ] or willful disobedience of the court's order[s]." Taylor, 133 Fed. Appx. at 710. Rather, it appears that Rivers' failure to pay the sanctions, while wholly unacceptable, more likely stems from an actual, present inability to pay. Acting in an abundance of caution, the court therefore recommends denying Asplundh's motion to dismiss this action for Rivers' failure to pay the monetary sanctions imposed against him. To the extent Asplundh requests that the court again direct Rivers to pay the amount of $1779.10 previously assessed as well as the additional amount of $6308.19, for a total amount of $8087.29—and to the extent such order and entry of judgment accordingly may assist Asplundh in its efforts to collect the full amount it is due from Rivers—the motion should be granted.

III.   MOTION TO STRIKE

The following brief summary of the facts of this case is sufficient for the purpose of discussing Asplundh's motion to strike. Asplundh provides line maintenance and tree trimming services to Florida Public Utilities ("FPU") in Marianna, Florida, and Gulf Power ("Gulf Power") in Panama City, Florida (Doc. 47-2, ¶ 2).[5] Asplundh staffs the crews who provide these services to

---

[5] The page references used in this Report reflect the page numbers as enumerated in the court's electronic docketing system rather than those the parties may have assigned.

Case No. 5:08cv61/RS/EMT

FPU and Gulf Power; the crews generally consist of one crew foreman and one groundsman or trimmer, both of whom are supervised by a general foreman (*id.,* ¶ 3). In April 2004 Asplundh hired Rivers to work under the FPU contract as a groundsman/trimmer (Doc. 55, ¶ 1; Doc. 47-7 at 23–24). In January 2006 Rivers was assigned to work under the Gulf Power contract (Doc. 47-4, ¶ 5; Doc. 47-7 at 9). In February 2006 Asplundh laid off some of its employees who were assigned to the Gulf Power contract, including Rivers (Doc. 47-7 at 64; Doc. 47-3, ¶ 2). Asplundh has not rehired Rivers.

In the instant motion Asplundh asserts that the court should strike those portions of Rivers' affidavit it submits are used to support a new claim of discrimination; are inconsistent with Rivers' prior deposition testimony; or contain conclusory allegations not based on Rivers' personal knowledge.[6] In his lengthy response in opposition, Rivers states that he does not seek to assert any new claims through statements made in his affidavit. Rivers further asserts that any inconsistencies between statements made at his deposition testimony and those in his affidavit are the result of his irritation and anger at defense counsel's repeatedly kicking him under the table during the deposition. Rivers also submits, without elaboration, that his affidavit is based on personal knowledge that was obtained through "direct conversations with the parties involved, events he personally observed, or statements he heard" (Doc. 61 at 3).

<u>New Claim</u>

Asplundh complains that Rivers' affidavit contains numerous references to hindrances he encountered while trying to complete the requirements necessary for him to obtain a Class B Commercial Driver's License ("CDL").[7] Asplundh contends that at this late date Rivers should not be permitted to make a new claim of race discrimination related to events surrounding his efforts to obtain a CDL, as such a claim would be outside the scope of the charge of discrimination Rivers filed with the EEOC and also is time-barred. Given Rivers' statement in his response to the motion that he does not seek to assert an additional claim related to his obtaining a CDL, but rather that these allegations are made in general support of his claims, the court denies this portion of

---

[6] The court addresses Asplundh's arguments not in the sequence presented by Asplundh but rather in the order it finds most conducive to efficient disposition.

[7] Rivers testified that obtaining this license would have made him eligible for promotion to crew foreman (Doc. 58-2 at 5). According to Rivers, in February 2007 he obtained a Class B CDL (Doc. 55, ¶ 73).

Asplundh's motion as moot.  It also denies as moot Asplundh's alternative motion for leave to file a reply.

Prior Deposition and Affidavit Testimony

Although summary judgment may be granted only if the record reflects that no genuine issue of material fact exists, *see* Tippens v. Celotex Corp., 805 F.2d 949, 952 (11th Cir. 1986); Fed. R. Civ. P. 56, parties may attempt to escape summary judgment by using affidavits to create issues of fact where none exist.  Under such circumstances, the court may disregard an affidavit as a "sham" if the affidavit flatly contradicts earlier deposition testimony in a manner that cannot be explained. Van T. Junkins and Assoc. v. U.S. Indus., 736 F.2d 656, 657 (11th Cir. 1984).  Under this approach, "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Id.*  Thus, as recognized in Tippens v. Celotex Corp., 815 F.2d 66 (11th Cir. 1987) (Hill, J., dissenting), an affidavit is properly considered a sham if "the affiant (1) makes a conclusory, unexplained assertion regarding a material fact which (2) directly contradicts that person's unequivocal deposition testimony." *Id.* at 68.  Even so, the court should only disregard affidavits in limited circumstances; "[e]very discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence."  Tippens, 805 F.2d at 954 (internal quotation marks omitted).  Care must be taken to distinguish "between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence." *Id.* at 953.  "In light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made in an early deposition." *Id.*

Asplundh first seeks to strike Rivers' statements in his affidavit that general foreman Tommy Bishop ("Bishop"), who supervised Rivers and Rivers' crew foreman Kenneth Redmon ("Redmon"), told Redmon that he would approve paying Rivers and Redmon for several days they could not work in January 2006 when their truck was unavailable.  According to Rivers' affidavit, "Bishop then told Redmon and Plaintiff to take Wednesday, January 4, 2006 off, and he would pay Redmon and Plaintiff for that day" (Doc. 55, ¶ 50).  "Bishop then told Plaintiff he would have to take another day off (Thursday, January 5, 2006), but he would pay Plaintiff and Redmon for that day also" (*id.*, ¶ 52). "On Friday morning, January 6, 2006 . . . Bishop then assured Plaintiff that he would get paid

January 4th, 5th and 6th, 2006 (Wed., Thurs., and Friday)" (*id.*, ¶ 53).   In his earlier-taken deposition, however, Rivers testified that he had not spoken directly with Bishop about payment for the days he and Redmon had not worked and instead had learned of Bishop's offer to pay the crew from Redmon:

> Q: Okay.  Now, did you receive pay for the week ending January 7, 2006, that you recall?
>
> A: I have no idea, but I know I received pay.  I can't recall a week that I didn't receive pay when I was working there.
>
> Q: And that includes weeks you were out because of the truck issue, correct?
>
> A: We wasn't out.  Let me explain this again.  The guy inspected the trucks.  And, like I said, when [another foreman's] truck was red-tagged, the next day we didn't have a truck.  And [Redmon] told me, "I'm trying to find out what's going on.  You know, they done took our truck.  We can't work."  I'm guessing that he had talked with [Bishop] because he told me that [Bishop] said don't worry about it, he's going to take care of us.  I'm thinking that he had to order the part that he had to order.  I was under the understanding or the understanding that [Redmon] left me with was that he had put a overnight order or something on them parts that he needed to get the truck back up, that it would take a day or two for them parts to get in.
>
> Q: And this was all information that Mr. Redmon gave you directly, correct?
>
> A: Yes. I had got it that he had got that from [Bishop] because I wasn't in no conversations that they had.
>
> Q: Did you ever speak with Mr. Bishop regarding this issue?  I'm sorry if I keep kicking you.  I'm sorry.
>
> A. I never had a conversation with Mr. Bishop.
>
> Q. Right.
>
> A. I can't remember no conversation with him about that.

(Doc. 58-2 at 8–9).

Elsewhere in his deposition Rivers also testifies repeatedly that he learned through Redmon that Bishop had offered to "take care of" him and Redmon for the days they had not been able to work because their truck had been temporarily assigned to another crew whose vehicle was out of

operation (Doc. 58-2 at 7,10–12).

The statements in Rivers' affidavit that Bishop informed him that Rivers and Redmon would be paid for the three days in January 2006 when the two crewmen did not work contradict Rivers' earlier clear and unambiguous deposition testimony that it was Redmon who provided Rivers with this information. Rivers' explanation that counsel for Asplundh repeatedly kicked him under the table during the deposition is not a satisfactory reason for his inconsistent testimony. Van T. Junkins and Assoc., 736 F.2d at 657. Nor, even though Rivers additionally states in his deposition that he did not specifically remember Bishop's ever having a conversation with him on the subject of the three days of paid time off—thus perhaps equivocating slightly in his testimony—Rivers does not offer any explanation for his different, current recollection in his affidavit, such as refreshed memory. This inconsistency is not a discrepancy that merely creates an issue of credibility or one that goes to the weight of the evidence; rather, it involves a discrepancy been Rivers' affidavit and his prior deposition testimony for which no adequate explanation has been proffered. Tippens, 805 F.2d at 953. Asplundh's motion to strike Paragraphs 50, 52, and 53 of Rivers' affidavit as sham allegations therefore is granted. Accordingly, those paragraphs are stricken.

Asplundh next asks that Paragraph 17 of Rivers' affidavit be stricken as a sham allegation. In Paragraph 17 Rivers asserts that the employment of another Asplundh worker, Kyle Watson, was terminated for failing to report to work on time on April 29, 2005. The deposition testimony to which Asplundh points, however, was simply that Rivers could not recall when the incident occurred (Doc. 58-2 at 14). No contradiction of prior clear and unequivocal deposition testimony is implicated. See Tippens, 815 F.2d at 68. To the extent this testimony has relevance to Rivers' claims, at most the inconsistency constitutes a discrepancy that might create an issue of credibility or go to the weight of the evidence. Asplundh's motion to strike Paragraph 17 of Rivers' affidavit as a sham allegation therefore is denied.

Asplundh also requests that the court strike Rivers' statements in Paragraphs 10, 11, and 37 of his affidavit that it was Bishop who denied him permission to use a company truck to complete an examination for the CDL. This part of Asplundh's motion is also denied. Again, to the extent the allegations are even relevant to Rivers' claims, the court does not view these statements as directly contradicting Rivers' deposition testimony. Rivers states in his deposition that he did not know for certain who had refused him permission to use the company truck for the examination,

though he thought it might have been Bishop, and that he had not spoken directly with Bishop about the matter (Doc. 58-2 at 3–5). Asplundh's motion to strike Paragraphs 10, 11, and 37 of Rivers' affidavit as sham allegations therefore is denied.

Personal Knowledge/Conclusory Allegations

Federal Rule of Civil Procedure 56 provides that affidavits "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e); *see, e.g.*, Dickinson v. Wainwright, 626 F.2d 1184, 1186 (5th Cir. 1980); Murrell v. Bennett, 615 F.2d 306, 310 n.5 (5th Cir. 1980).[8] "[M]ere conclusions and unsupported factual allegations, as well as affidavits based, in part, upon information and belief, rather than personal knowledge, are insufficient to withstand a motion for summary judgment." Ellis v. England, 432 F.3d 1321, 1327 (11th Cir. 2005). Including a blanket statement in the affidavit that it is made upon personal knowledge will not save statements that are made upon mere belief, no matter how strong the belief may be. *See* Pace v. Capobianco, 283 F.3d 1275, 1279 (11th Cir. 2002). Additionally, affidavits containing broad assertions that are made without specific supporting facts are insufficient to prevent summary judgment. *Id.* at 1280 (citation omitted).

Asplundh contends that, in whole or part, Paragraphs 12, 17, 18, 25, 30, 31, 37, 49, 74, 76, 78, 79, and 80 of Rivers' affidavit (Doc. 55) should be stricken because they fail to show they are based on Rivers' personal knowledge or they are conclusory and not supported by factual evidence. Assuming for the purpose of this discussion that the following italicized paragraphs or portions of paragraphs have relevance to Rivers' claims, the court agrees that they lack sufficient factual support and/or do not reflect a foundation based on personal knowledge:

Paragraph 17: On or about April 29, 2005, Mr. Kyle Watson, Trimmer on Foreman Gary Williams' crew arrived late to work at the Florida Public Utilities Company. Mr. Jackie Ditty, the Supervisor at FPU and over Defendants' four (4) crews at FPU discharged Watson from working for FPU *because of Mr. Watson's excessive tardy record*. Foreman Gary Williams had to work with other crews until a replacement for Watson was hired by Defendant.

Paragraph 18: *Mr. Tommy Bishop, General Foreman, was aware that Mr. Jackie*

---

[8] Fifth Circuit decisions rendered prior to September 30, 1981, are binding precedent on this court. *See* Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1981).

*Ditty had discharged Watson for excessive tardiness in April 2005.*

Paragraph 25:  Watson was again rehired with Defendant.  *On April 29, 2005, Mr. Jackie Ditty of FPU discharged Watson for excessive tardiness.  . . .*

Paragraph 37:  Plaintiff also tried to get Redmon to get permission from Bishop to take the CDL test with Redmon's truck.  *Bishop still denied Plaintiff permission to use Redmon's truck.*

Paragraph 74:  In March 2007, Plaintiff read an ad in Panama City News Herald newspaper. . . .  In this ad Defendant was seeking to hire experienced Foreman and trimmers for full-time, year round employment.  The ad does not mention or require applicants to have a CDL license.  The contact person for Defendant was named Tommy Bishop.  *Plaintiff is aware that all individuals Bishop hired through this ad [ ] are Caucasian.*

Paragraph 76:  Plaintiff is also aware that Kyle Watson quit his trimmer position with Defendant in April 2008.  Tommy Bishop . . . recommended that Watson was suitable for re-hire.  *Watson's replacement [   ] is Caucasian and was hired by Bishop.*

Paragraph 78:  Defendant's policy for using or possession of illegal drugs is a discharge offense.  *Bishop [ ] did not require [another employee who admitted he had been jailed for possession of marijuana] to take a drug screen test. . . .*

Paragraph 80: *Plaintiff is also aware that Defendant never discussed, questioned or wrote a letter to Redmon with allegations of Redmon falsifying a time sheet, forging General Foreman Bishop's signature on time sheets to get money Redmon did not earn or that Redmon was discharged and under "no re-hire" status for violation of company policy.*

The court therefore grants Asplundh's motion to strike the above italicized paragraphs or portions of paragraphs of Rivers' affidavit (Paragraphs 17, 18, 25, 37, 74, 76, 78, and 80 of Doc. 55).  The court finds that the remaining paragraphs or portions of paragraphs challenged by Asplundh (Paragraphs 12, 30, 31, 49, and 79) have an adequate factual basis or foundation of personal knowledge.  It therefore denies Asplundh's motion to strike as to those paragraphs.[9]

---

[9]  Accordingly, in outlining the undisputed facts in this case, below, and otherwise conducting its summary judgment review, the court considers only the admissible portions of Rivers' affidavit.  *See* Lee v. Nat'l Life Assur. Co. of Canada, 632 F.2d 524, 529 (5th Cir. 1980) ("The rule is settled that on a motion for summary judgment a court will disregard only the inadmissible portions of a challenged affidavit offered in support of or opposition to the motion and will consider the admissible portions in determining whether to grant or deny the motion.")

IV.    RELEVANT FACTS[10]

The following facts are derived from the parties' statements of facts and, except as noted, are undisputed. Rivers began working for Asplundh in April 2004 as a groundsman/trimmer on a temporary basis but was soon hired for a permanent position (Doc. 55, ¶ 1; Doc. 47-7 at 3–6). During his employment Rivers was primarily stationed in Marianna, but he also traveled to other parts of Florida on occasion to handle storm work (Doc. 47-7 at 7–8). Sometime in 2005 Rivers was assigned to Redmon's Marianna crew (*id.* at 12). According to Rivers, on January 3, 2006, he and Redmon cleared lines for several hours before being directed to take their truck to another location for an annual safety inspection (Doc. 55, ¶¶ 42, 43). The truck used by Redmond and Rivers passed inspection but another crew's truck failed and was taken out of service awaiting the arrival of a repair part (Doc. 47-7at 20–21; Doc. 55, ¶¶ 43–45).

Redmon and Rivers were newer than the two-man crew assigned to the out-of-service vehicle so Bishop, as their general foreman, assigned the serviceable truck—which had been used by Redmon and Rivers—to the more senior crew (Doc. 47-4, ¶ 3). Redmon and Rivers were sent home to await the repair of the out-of-service truck; the repairs were expected to take approximately one or two days (Doc. 47-7 at 21–22; 55; Doc. 55, ¶¶ 50, 52). Rivers acknowledges that although he and Redmond did not perform any work for Asplundh January 4, 5, or 6, 2006, they were paid for those days (*id.* at 21–22, 52). Rivers contends that he showed up for work each day but that Bishop sent him home because their truck was not yet operational (*id.* at 56). Rivers was concerned about losing pay for the days he was unable to work because Asplundh's policy is that "[i]f you didn't work, you didn't get paid" (*id.* at 57). Rivers understood from his conversations with Redmon, however, that because Bishop did not want to complete all of the paperwork necessary to lay them off briefly he would "take care" of them; to Rivers, this meant they would receive pay for the time they had been unable to work for lack of a vehicle (Doc. 47-7 at 21–22; Doc. 58-2 at 7,10–12). Redmon submitted a handwritten timesheet for the week ending January 7, 2006, which shows that he and Rivers did

---

[10]   As this case comes before the court on Asplundh's motion for summary judgment, the court views the facts in the light most favorable to Rivers as the non-moving party, *see* Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993), drawing those facts from the pleadings, depositions, and other evidentiary materials on file. Nevertheless, the court observes that what are stated as "facts" herein for purposes of summary judgment review may not be the actual facts. *See* Montount v. Carr, 114 F.3d 181, 182 (11th Cir. 1997). The court does not include in its recitation of the facts numerous matters referenced by the parties in their statements of facts because it concludes those facts are not material to the legal issues presented by Rivers' claims.

not work Monday, January 2, 2006, a holiday, but that they worked January 3 through January 6, for a total of thirty-two (32) hours each (Doc. 47-7 at 93; Doc. 56 at 39).[11] The "Remarks" section of the timesheet states: "Mechanic: wait on truck. OK by Tommy Bishop" (*id.*). In the space on the timesheet designated "Foreperson or Acting Foreperson" is written the name "Kenneth W. Redmon," with the name "Tommy Bishop" written in the space designated "General Foreman" (*id.*). Rivers states that on January 6, 2006, Redmon delivered Rivers' pay check for the week ending January 7, 2006, to him at his home; Redmon told Rivers that he and Bishop had gotten together earlier that day and prepared the timesheet and that Bishop had approved paying Redmon and Rivers for January 4, 5, and 6, 2006 (Doc. 55, ¶¶ 54, 55). Rivers maintains that he was never responsible for preparing weekly timesheets while employed by Asplundh; rather, that task was performed by the crew foreman, who was Redmon on the date in question (Doc. 47-7 at 53). Rivers also never reviewed or signed a timesheet when he worked for Asplundh, much less the one for the week ending January 7, 2006 (*id.* at 53–54*)*. In a statement dated September 6, 2006, Bishop wrote that he did not recall Redmon's crew working on equipment during the week ending January 7, 2007 (Doc. 56 at 41). If the crew had been working, Bishop submits in the statement, he would have signed their timesheet but the signature on the sheet for the week at issue was not his; therefore, he states, someone else must have signed his name on the timesheet for the period ending January 7, 2006[12] (*id.*).

Sometime during the period that Redmon and Rivers were not working, Asplundh learned that it had to cut one of the four crews that were assigned to the FPU contract for the Marianna region (Doc. 47-7 at 9–10, 23). Bishop determined that, as the newest crew, the Redmon/Rivers team had to be eliminated, either by being transferred or being laid off (Doc. 47-4, ¶ 5). Bishop did not want to lay off the crew, so he found positions for Redmon and Rivers in Panama City working under the Gulf Power contract (Doc. 47-7 at 29; Doc. 47-4, ¶ 5). The two men began working in Panama City approximately one week later under the supervision of general foreman Jimmy

---

[11] The copies of the timesheet submitted by Asplundh and Rivers (Doc. 47-7 at 93; Doc. 56 at 39) are somewhat illegible and thus the information contained in the fine print is described to the best of the court's ability.

[12] The following week, which ended January 14, 2006, Redmon and Rivers still did not have a truck assigned to them (*id.* at 57), and thus they did not work, but there appears to be no question that they did not receive pay for that week.

Harrison ("Harrison") (*Id.* at 24; Doc. 47-3, ¶ 1).  In February 2006 Gulf Power informed Asplundh that due to budget concerns Asplundh would have to lay off some of its Panama City crews (Doc. 47-7 at 25–26; Doc. 47-3, ¶ 2).  According to Harrison, Asplundh wanted to retain its supervisors and foremen, even if it meant demoting them, so that there would be qualified employees available to lead crews later as might be needed (Doc. 47-3, ¶ 2).  Rivers, who was not a foreman and did not at that time have the CDL required for foremen, was laid off; Redmon, who had a CDL, was demoted from foreman to trimmer (*id.*, ¶¶ 3, 4, 5).  On or about February 6, 2006, Harrison informed Redmon about the layoffs, who then told Rivers (Doc. 47-7 at 25–26).  In total, approximately twenty employees were laid off from the Gulf Power account in February 2006 (Doc. 47-3, ¶ 3).

Asplundh does not have a formal recall policy for employees it has laid off (Doc. 47-2, ¶ 8), and Rivers was never promised that he would be rehired (Doc. 47-7 at 48–49).  Rivers nevertheless let Harrison know that he was interested in returning to work when positions became available; Rivers never heard from him, however (*id.* at 32).  Redmon advised Rivers in March 2006 that he was resigning from his position with Asplundh to work for another tree trimming company (Doc. 47-7 at 37–38).  Hearing this news, Rivers informed Asplundh that he was interested in filling the position vacated by Redmon, but he was not contacted about the job (*id.* at 46).  According to Asplundh, it did not intend to fill Redmon's position and did not do so (Doc. 47-5, ¶ 5).

In or around April 2006, a Gulf Power representative called Harrison to question the January 7, 2006, timesheet submitted for Rivers and Redmon (Doc. 47-3, ¶ 9).  Harrison, as the Panama City supervisor for the Gulf Power work, had no knowledge of the timesheet (*id.* at ¶ 10), which in fact referenced Bishop, the general foreman on the FPU account at the time in question.  Harrison reported the issue to Michael Smith, a regional vice president for Asplundh (*id.* at ¶ 11; Doc. 47-2, ¶ 9).  Upon Smith's inquiry, Bishop examined the timesheet and determined that he had not reviewed or approved it (Doc. 47-4, ¶ 11).  Rivers was not contacted or questioned about the matter (Doc. 47-7 at 51).  Smith concluded that, because the crew foreman was responsible for completing and submitting timesheet, it appeared that Redmon had submitted a forged timesheet and that he and Rivers had knowingly accepted pay for time they had not worked (Doc. 47-2, ¶ 11).  According to Smith, submitting falsified or forged timesheets and accepting pay for time not worked constitutes theft and is immediate grounds for dismissal from Asplundh (*id.* at 12).  Smith therefore informed Danny McGuire, an Asplundh general foreman who is authorized to make personnel decisions, that

Redmon and Rivers—who at that time were not employees of Asplundh—were not eligible for rehire (*Id.*; Doc. 47-5, ¶ 6).

In July 2006 Asplundh foreman Gary Williams ("Williams") needed an additional worker because one of his trimmers was transferring to another city (Doc. 47-6, ¶ 4). McGuire did not post a formal announcement for the trimmer position but instead asked Williams if he could recommend someone for the job (Doc. 47-5, ¶ 7; Doc. 47-6, ¶ 4). Williams recommended former employee Kyle Watson ("Watson"), with whom Williams had previously worked (Doc. 47-5, ¶ 7; Doc. 47-6, ¶ 5). According to Williams, Watson was mechanically inclined and knew the Marianna area well (Doc. 47-6, ¶ 5). Moreover, because he possessed a CDL—a qualification Williams knew Rivers did not have—Watson could drive the company's trucks and act as a foreman when necessary (*id.* at ¶¶ 5, 6 ). Based on Williams' recommendation, McGuire hired Watson to work as a trimmer under the FPU contract in Marianna  (Doc. 47-5 ¶ 7).

Rivers attempted to call Smith when he learned that Watson had been rehired; when he did not hear from Smith, Rivers sent him a letter dated August 14, 2006, in which he asserted he had been discriminated against when Asplundh did not rehire him but instead rehired Watson, who is white  (Doc. 47-7 at 90–92; Doc. 56 at 43–45). Rivers expressed his continued interest in returning to work for Asplundh and pointed to his record, including his demonstrated willingness to travel out of town to perform storm damage work and to take on tough assignments in hostile environments; his accident-free and discipline-free work history; and his completion of all requirements of the company's line clearance certification program[13] (*id.*). Smith forwarded Rivers' letter to Asplundh's corporate management, along with the information that neither Rivers nor Redmon had been considered for the vacant position because they had accepted pay for time they had not worked (Doc. 47-2, ¶ 14). Asplundh vice president and general counsel Phillip E. Tatoian, Jr. ("Tatoian"), wrote a letter to Rivers dated September 8, 2006, in response to Rivers' letter of complaint (Doc. 56 at 47). Tatoian's letter advises Rivers that, based on conversations with Bishop, the company had determined Rivers and Redmon had claimed to have worked on equipment for 32 hours the week ending January 7, 2006 (*id.*). Tatoian also noted that Bishop had provided Asplundh with a written statement indicating that he had not seen or approved the timesheet (*id.*). According to Tatoian, the

---

[13]  Rivers also reports that he has obtained certifications for crew foreman, bucket operator, climber/trimmer; herbicide foreman; and aerial lift inspector (Doc. 55, ¶ 13).

timesheet apparently had been falsified by Redmon, resulting in the two having been paid for time that Asplundh believed they had not worked (*id.*). Tatoian informed Rivers that Asplundh would not change the characterization of Rivers' separation from being laid off to being fired for falsifying a timesheet; Asplundh would permit him to remain listed as laid off and thus eligible to collect unemployment insurance benefits (*id.*). According to Tatoian, Asplundh would not, however, rehire Rivers based on the results of its investigation "which established adequate proof that a timesheet was falsified and you received a check for money you knowingly did not earn" (*id.*). Rivers denies that he submitted a falsified timesheet to Asplundh, conspired with Redmon to receive money he did not earn, or forged any signatures (Doc. 55, ¶¶ 40, 41).

In late March 2007, when Asplundh needed additional manpower, it posted a newspaper advertisement seeking groundsmen and trimmers (Doc. 56 at 58). Rivers saw the advertisement but did not apply (Doc. 47-7 at 79–81; Doc. 47-4, ¶14). According to Rivers, he did not apply due to his "no re-hire" status with Asplundh (Doc. 55, ¶ 75).

V.     LEGAL STANDARDS

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, show that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. *See* <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). "The mere existence of *some* alleged factual dispute between the parties," however, "will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986) (emphasis in original). A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A fact is "material" if it may affect the outcome of the case under the applicable substantive law. *See id.*

When a motion for summary judgment is made and properly supported by affidavits, depositions, or answers to interrogatories, the adverse party may not rest on the mere allegations or denials of the moving party's pleadings. Instead, the nonmoving party must respond by affidavits or otherwise and present specific allegations showing that there is a genuine issue of disputed fact for trial. Fed. R. Civ. P. 56(e). In assessing the sufficiency of the evidence, the court must view all the evidence, and all factual inferences reasonably drawn therefrom, in the light most favorable to

the nonmoving party. *See* <u>Hairston</u>, 9 F.3d at 918. A mere scintilla of evidence in support of the nonmoving party's position will not suffice to demonstrate a genuine issue of material fact and thereby preclude summary judgment. *See* <u>Walker v. Darby</u>, 911 F.2d 1573, 1577 (11th Cir. 1990). If the adverse party fails to show a genuine issue of material fact, summary judgment, if appropriate, may be entered against the nonmoving party.

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). A plaintiff can establish a claim for employment discrimination through the use of direct, circumstantial, or statistical evidence. <u>Standard v. A.B.E.L. Services, Inc.</u>, 161 F.3d 1318, 1330 (11th Cir. 1998). Direct evidence is defined as evidence "that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption." Black's Law Dictionary 596 (8th ed. 2004); *see also* <u>Clark v. Coats & Clark, Inc.</u>, 990 F.2d 1217, 1226 (11th Cir. 1993). Only the most blatant remarks whose intent could only be to discriminate constitute direct evidence. *Id.* Evidence that merely "suggests discrimination, leaving the trier of fact to infer discrimination based on the evidence" is, by definition, circumstantial. <u>Earley v. Champion Int'l Corp.</u>, 907 F.2d 1077, 1081–82 (11th Cir. 1990).

In a case in which, as here, the plaintiff relies on circumstantial evidence, the claim is evaluated using the three-step framework established by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) and <u>Texas Dep't of Comm. Affairs v. Burdine</u>, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). Under this framework, the plaintiff has the initial burden of establishing a prima facie case of discrimination, thus creating a rebuttable presumption that an employer acted unlawfully. <u>Wilson v. B/E Aerospace, Inc.</u>, 376 F.3d 1079, 1087 (11th Cir. 2004). The Eleventh Circuit has noted that the method of establishing a prima facie case is not fixed, but rather is flexible and dependent on the employment situation. *Id.* (citation omitted). A plaintiff may establish a prima facie case of discrimination in a reduction of force claim by demonstrating that (1) he was a member of a protected group and was adversely affected by an employment decision; (2) he was qualified for his own position or to assume another position at the time of the discharge; and (3) his employer intended to discriminate against him in making the discharge decision. <u>Standard</u>, 161 F.3d at 1331 (citing <u>Benson v. Tocco, Inc.</u>, 113 F.3d

1203, 1208 (11th Cir. 1997)); *see also* Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997), and Maniccia v. Brown, 171 F.3d 1356, 1368 (11th Cir. 1999); Nix v. WLCY Radio/Rahall Comms., 738 F.2d 1181, 1185 (11th Cir. 1984). The requirements for establishing a prima facie case of discrimination in a failure to rehire claim are similar. The plaintiff must demonstrate that (1) he belongs to a racial minority; (2) he applied and was qualified for a job for which the employer was seeking applicants; (3) he was rejected despite his qualifications; and (4) after his rejection, the position remained open and the employer continued to seek applicants from persons of the plaintiff's qualifications. McDonnell Douglas Corp., 411 U.S. at 802; *see also* Underwood v. Perry County Commission, 431 F.3d 788 (11th Cir. 2005) (indicating that plaintiff must show he is a member of a protected class; was qualified for the position and applied for it; was not considered for the position despite his qualifications; and equally or less qualified individuals outside of his protected class were considered or hired for the position). Should the plaintiff fail to establish a prima facie case, summary judgment is warranted if there is no other evidence of discrimination. Holifield, 115 F.3d at 1562 (citing Mack v. Great Atlantic and Pacific Tea Co., 871 F.2d 179, 182 (1st Cir. 1989)). The standard for demonstrating a prima facie case is not onerous, requiring "only that the plaintiff establish facts adequate to permit an inference of discrimination." *Id.* (citations omitted).

Once the plaintiff has established a prima facie case or shown some other evidence of discrimination, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. McDonnell Douglas, 411 U.S. at 802. This justification should be "clear, reasonably specific, and worthy of credence." Hall v. Ala. Ass'n of School Boards., 326 F.3d 1157, 1166 (11th Cir. 2003). The employer, however, need not persuade the court that it was actually motivated by the proffered reason. Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997) (quoting Burdine, 450 U.S. at 254). Thus the defendant's burden is one of production, not persuasion. Wilson, 376 F.3d at 1087–88. The Eleventh Circuit has stated that this burden is "exceedingly light." Holifield, 115 F.3d at 1564 (quoting Turnes v. AmSouth Bank, N.A., 36 F.3d 1057, 1061 (11th Cir. 1994)). Once the employer satisfies its burden of production by articulating one or more legitimate, nondiscriminatory reasons for its action, the presumption of discrimination is eliminated and the burden of production shifts back to the plaintiff to offer evidence that the alleged reason is a pretext for illegal discrimination. Wilson, 376 F.3d at 1087. The plaintiff can satisfy this requirement either directly by "persuading the court that a

discriminatory reason more than likely motivated the employer" or indirectly by "persuading the court that the proffered reason for the employment decision is not worthy of belief." Hall, 326 F.3d at 1166. The plaintiff can establish that an employer's reasons are pretextual by showing "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" Cooper v. Southern Co., 390 F.3d 695, 725 (11th Cir. 2004) (quoting Combs, 106 F.3d at 1538). The plaintiff, however, "cannot succeed by simply quarreling with the wisdom of that reason." Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000) (quotation and citation omitted). A plaintiff does not establish pretext by arguing that the defendant's decision was mistaken. *See* Wilson, 376 F.3d at 1092 (quoting Lee v. GTE Florida, Inc., 226 F.3d 1249, 1253 (11th Cir. 2000)). Rather, he must show that the decision was motivated by the plaintiff's race. *Id.* Title VII allows employers to terminate an employee for "a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." Nix, 738 F.2d at 1187.

Finally, despite the shifting of the burden of production between the plaintiff and the defendant under the McDonnell Douglas framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Wilson, 376 F.3d at 1088 (quoting Burdine, 450 U.S. at 253). Because of this, even though a plaintiff may establish a prima facie case and set forth sufficient evidence to reject the defendant's explanation, if no rational factfinder could conclude that the employer's action was discriminatory, then summary judgment may be warranted. Chapman, 229 F.3d at 1025 n.11 (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148, 120 S. Ct. 2097, 2109, 147 L. Ed. 2d 105 (2000)).

VI.     DISCUSSION

Reduction in Force

Asplundh concedes that Rivers is a member of a protected group and that he was adversely affected by the decision to lay him off; it also concedes that Rivers was qualified to hold his position as groundsman/trimmer. Thus, Rivers has satisfied the first two elements of the prima facie case

of discriminatory reduction in force. *See* <u>Standard</u>, 161 F.3d at 1331. Asplundh contends, however—and in his response (Doc. 54) Rivers offers no argument in opposition—that the undisputed evidence shows that Rivers cannot make out the third element of the prima face case, which requires Rivers to show that Asplundh intended to discriminate against him when it laid him off. *Id.* The court agrees.

In deciding which of its employees to lay off in February 2006 after Gulf Power told Asplundh to reduce the number of crews working in the Panama City area, Asplundh attempted to keep its foremen and supervisory personnel. This business decision was reasonably guided by the its interest in retaining employees who were not only qualified to perform the duties of a groundsman/trimmer but also could take on the responsibilities of foreman when additional crews might be needed. Rivers has acknowledged that to become eligible for promotion to foreman he needed a CDL. Rivers did not hold this license in February 2006 but Redmon did. Moreover, Rivers was not the only employee laid off by Asplundh. Approximately twenty workers were discharged in February 2006, including—to Rivers' knowledge—a white groundsman/trimmer and a white foreman (Doc. 47-7 at 36–37). Absent a showing that Asplundh acted with the intent to discriminate against him, Rivers cannot establish a prima facie case of race discrimination based on being laid off from his employment in February 2006. As there is no other record evidence that Asplundh discriminated against Rivers when it laid him off, *see* <u>Holifield</u>, 115 F.3d at 1562, Rivers' reduction in force claim therefore fails at this stage of the analysis.

Assuming, *arguendo*, that Rivers had established a prima facie case of race discrimination in connection with his lay-off, the court nevertheless concludes that this claim cannot survive summary judgment. As noted, Asplundh wished to keep employees who could perform both the job of groundsman/trimmer and foreman; as the foreman job required the employee to possess a CDL—a qualification Rivers did not have at the time but that Redmon did have—Rivers was not retained and Redmon was. Thus, Asplundh has met its burden of production by articulating a legitimate nondiscriminatory business reason for laying off Rivers. <u>McDonnell Douglas</u>, 411 U.S. at 802. The burden of production now shifts back to Rivers to come forward with evidence that Aplundh's alleged reason is a pretext for illegal discrimination. *See* <u>Wilson</u>, 376 F.3d at 1087.

Rivers has failed to do so.[14]  As a final matter, even if Rivers had established a prima facie case and set forth some evidence of pretext, which he has not, the court is convinced that no rational factfinder could conclude that Asplundh's decision to lay Rivers off in February 2006 was discriminatory; thus summary judgment is appropriate.  Chapman, 229 F.3d at 1025 n.11.

No genuine issues of material fact exist with respect to Rivers' discriminatory reduction in force claim.  The court therefore recommends that judgment as a matter of law be entered in Asplundh's favor.

Failure to Rehire

Asplundh next argues that Rivers is unable to establish a prima facie case of discrimination in connection with his failure to rehire claim.  According to Asplundh, Rivers cannot show that he applied for the position of groundsman/trimmer—or should have been considered for it—or that equally or less qualified individuals in fact were hired to fill the job.  Rivers responds that summary judgment is not appropriate.  He apparently argues that a genuine issue of material fact exists with respect to whether he should have been considered for the July 2006 vacancy that was filled by Watson, an employee whom on several prior occasions Asplundh discharged for excessive tardiness and failing to report to work.

As an initial matter, to the extent Rivers argues that he should have been considered for a position with Asplundh when Redmon resigned from the company in March 2006,  the court finds Rivers has failed to establish a prima facie case.  Asplundh states, without dispute, that it did not intend to fill Redmon's trimmer position when he resigned nor did it do so.  Thus Rivers has not established that Asplundh sought applicants for the job vacated by Redmon, much less that Rivers applied for the position, was qualified for it, or was rejected in favor of another applicant.  McDonnell Douglas Corp., 411 U.S. at 802.  Additionally, to the extent Rivers contends he was discriminated against when Asplundh advertised for groundsmen/trimmers in March 2007 but did

---

[14] Rivers complains that he was somehow discouraged or prevented from obtaining a CDL because he was not given permission to borrow a company truck to take the final examination.  While Rivers does not explicitly argue this, it appears he contends that, had he possessed the license and been promoted to foreman, he would not have been laid off.  To the extent Rivers attempts to show that the reason he was laid off was pretextual and that in fact he was laid off as a result of Asplundh's discriminatory refusal to permit him to borrow a company truck to obtain his CDL, which would ultimately have resulted in his retention during the February 2006 lay-off, the attempt fails.  Any connection between Asplundh's refusal to lend Rivers the truck and Rivers' lay-off is far too attenuated—and the possibility that Rivers would not have been laid off if he had possessed the license in February 2006 far too speculative—to be plausible.

not hire him, his allegations are likewise insufficient. Rivers cannot satisfy the second element of the prima facie case, as he acknowledges that although he was aware of the advertisement he did not apply for the position. *Id.; see also* Jones v. Alabama Power Co., 282 Fed. Appx. 780, 785 (11th Cir. 2008) (holding that where employer uses formal measures to announce positions and select candidates, plaintiff cannot establish a prima facie case of retaliatory failure to rehire unless he applied for the position).

The court further concludes that Rivers cannot make out a prima facie case in connection with his allegation that he was discriminated against when Asplundh rehired Watson instead of him in July 2006 to work as a groundsman/trimmer. Asplundh acknowledges that it did not advertise this position. Instead, McGuire asked Williams if he could recommend anyone to fill the job and Williams recommended Watson, whom McGuire then hired. When, as here, the employer does not formally announce the post, the plaintiff need not demonstrate that he applied for the job; rather, he must only show that the employer had some reason to consider him for the position. Greer v. Birmingham Beverage Co., Inc., 291 Fed. Appx. 943, 945 (11th Cir. 2008 (citing Vessels v. Atlanta Independent School System, 408 F.3d 763, 768 (11th Cir. 2005)). "To show he was qualified, a plaintiff need only show that he 'satisfied an employer's objective qualifications.'" *Id.* Rivers cannot establish either of these elements. First, Asplundh had no reason to consider Rivers for the position, based on its prior determination that Rivers was not eligible for rehiring because he had accepted pay for time he had not worked. Additionally, the evidence reflects Asplundh's policy of employing, where possible, trimmers who held CDLs and that in part Williams based his recommendation that Watson be rehired on the fact that Watson had the license, while Rivers did not. Thus Rivers can neither show that he was qualified for the open position or that an equally or less qualified individual was hired for the position. *See* Greer, 291 Fed. Appx. at 945, and Underwood, 431 F.3d at 794. Rivers therefore has not demonstrated all required elements of a prima facie case of race discrimination for failure to rehire. Nor is there any other sufficient evidence showing that Asplundh discriminated against Rivers when it did not rehire him. *See* Holifield, 115 F.3d at 1562. The court therefore concludes that River's failure to rehire claim fails.

Notwithstanding its conclusion that Rivers has not satisfied the prima facie requirements for a failure to rehire claim, the court will assume, *arguendo*, that he has. Asplundh therefore assumes the burden of production in articulating a legitimate, nondiscriminatory reason for not rehiring

Rivers. <u>McDonnell Douglas</u>, 411 U.S. at 802. Asplundh's proffered reasons—that it decided to rehire Watson because he had a CDL and was not on "no rehire" status, and did not rehire Rivers, who did not have the CDL and was on "no rehire" status—are "clear, reasonably specific, and worthy of credence." <u>Hall</u>, 326 F.3d at 1166. Rivers complains that Watkins had a poor prior work record with Asplundh, including a long history of poor attendance and tardiness, while his own prior record in those respects was superior. Rivers also adamantly asserts that he was not involved in any falsification of the January 7, 2006, timesheet. Asplundh is not required, however, to convince the court that it was actually motivated by the proffered reasons for failing to rehire Rivers. *See* <u>Combs</u>, 106 F.3d at 1528. The court need only conclude that Asplundh's reasons are legitimate and nondiscriminatory, which it does.

It now becomes Rivers' burden to produce evidence that the alleged reasons are mere pretext for illegal discrimination. *See* <u>Wilson</u>, 376 F.3d at 1087. Even if Rivers' work history with Asplundh in fact was superior to Watkins', Rivers has proffered nothing that indicates Asplundh's decision to rehire Watkins instead of him more than likely was motivated by race or is simply not believable. *See* <u>Hall</u>, 326 F.3d at 1166. There is no evidence that suggests the decision was based on anything other than Asplundh's reasonable, good-faith belief that Watson's was well-qualified, including that he held a CDL, a qualification Williams believed—correctly—that Rivers did not have. *Cf.* <u>Nix</u>, 738 F.2d at 1187 (stating that an employer only violates the law if its decision was based on discriminatory reasons, not if it was based on incorrect facts). Additionally, even if Rivers in fact thought Bishop had approved paying him and Redmon for time they did not actually work in January 2006, and even if Asplundh unfairly or erroneously concluded that Rivers knowingly accepted pay to which he was not entitled, Rivers cannot establish pretext by arguing that Asplundh's decision was mistaken. *See* <u>Wilson</u>, 376 F.3d at 1092; <u>Nix</u>, 738 F.2d at 1187. Moreover, as the Eleventh Circuit has noted,

> For purposes of Title VII analysis, it is thus of no consequence that [plaintiff] now disputes the [disciplinary] charges. The law is clear that, even if a Title VII claimant did not in fact commit the violation with which he is charged, an employer successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation.

<u>Jones v. Gerwens</u>, 874 F.2d 1534, 1540 (11th Cir. 1989).

Based on the results of Asplundh's investigation of the incident, including the inquiry made

of Bishop, the court is persuaded Asplundh has demonstrated that it held the honest belief that Rivers committed the infraction of accepting pay for work he did not perform.

Courts are "not in the business of adjudging whether employment decisions are prudent or fair.  Instead our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision."  Lee, 226 F.3d at 1253 (quoting Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1361 (11th Cir. 1999)).  The record is devoid of any evidence that Asplundh's failure to rehire Rivers was a pretext for an underlying racially discriminatory motive.  Even if a modicum of such evidence existed, however, no rational factfinder could conclude that Asplundh discriminated against Rivers when it failed to rehire him, making summary judgment in Asplundh's favor warranted on this claim.  Chapman, 229 F.3d at 1025 n.11.

In sum, the court concludes that no genuine issues of material fact exist with respect to Rivers' discriminatory failure to rehire claim.  It therefore recommends that judgment as a matter of law be entered in Asplundh's favor on this claim.

VII.   CONCLUSION

This court grants Defendant Asplundh Tree Expert Company's motion to strike portions of Rivers' affidavit, to the extent Paragraphs 17, 18, 25, 37, 50, 52, 53, 74, 76, 78, and 80 of the affidavit are stricken; the motion is denied in all other respects.  In addition, the court finds that Rivers should pay Asplundh the additional sum of $6308.19 for expenses incurred in Asplundh's filing its third motion to compel and two motions for sanctions, thus making the total of the amount now due to Asplundh $8087.29.

Further, the court recommends that Asplundh's motion for enforcement of sanctions be granted, to the extent Rivers should be directed to pay Asplundh the total amount of $8087.29 in sanctions, with judgment entered in Asplundh's favor for that amount; the motion should be denied in all other respects.  Finally, as Rivers has failed to demonstrate that any genuine issues of material fact remain for trial with respect to his discriminatory reduction in force and failure to rehire claims, summary judgment should be entered in Asplundh's favor on both claims.

Accordingly, it is **ORDERED:**

1.   Defendant Asplundh Tree Expert Company's motion to strike portions of Plaintiff Angelo Pecello Rivers' affidavit (Doc. 58) is **GRANTED in part** and **DENIED in part:**

 The motion is **GRANTED** to the extent that the following italicized paragraphs or portions

of paragraphs of the affidavit, as identified above, are stricken: Paragraphs 17, 18, 25, 37, 50, 52, 53, 74, 76, 78, and 80; the motion is **DENIED** in all other respects.

2.      Defendant is entitled to be paid the sum of $6308.19 by Plaintiff for fees Defendant incurred in filing its third motion to compel and two motions for sanctions.

3.      The clerk is directed **SEAL** the exhibits attached to Docket Entry # 56 (pp. 7– 63).

And it is respectfully **RECOMMENDED**:

1.      That Defendant's motion for enforcement of sanctions (Doc. 63) be **GRANTED in part** and **DENIED in part**:

**GRANTED**, to the extent Plaintiff shall pay the amount of $1779.10 in sanctions previously assessed as well as the additional amount of $6308.19 in new sanctions ordered above, for a total of $8087.29 due to Defendant Asplundh Tree Expert Company.  The motion should be **DENIED** in all other respects.

2.      Defendant's motion for summary judgment (Doc. 45) be **GRANTED**.

3.      That judgment be entered in favor of Defendant Asplundh Tree Expert Company.

At Pensacola, Florida this 24th day of August 2009.

                                         /s/ Elizabeth M. Timothy
                                         **ELIZABETH M. TIMOTHY**
                                         **UNITED STATES MAGISTRATE JUDGE**

**NOTICE TO THE PARTIES**

**Objections to these proposed findings and recommendations may be filed within ten (10) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  See 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**